AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
|  | ) Case No.  **23 MR 1118** |
| A residence located at 716 Old Coors Dr. SW, | ) |
| Albuquerque, NM 87121 | ) |
|  | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A, INCORPORATED BY REFERENCE.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B, INCORPORATED BY REFERENCE.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| Title 8 USC Code § 1324 | Conspiracy to transport and conspiracy to harbor certain aliens |

The application is based on these facts:

See attached affidavit, submitted by SA Benjamin Munoz and approved by AUSA Letitia Carroll Simms.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Benjamin Munoz, HSI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonically sworn and electronically signed.     *(specify reliable electronic means)*.

Date:     06/01/2023

*Judge's signature*

City and state:  Albuquerque, New Mexico

John F. Robbenhaar, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF
716 OLD COORS DRIVE SW,
ALBUQUERQUE, NEW MEXICO 87121

Case No. _____

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Benjamin Munoz, a Special Agent of Homeland Security Investigations (HSI), being

duly sworn, deposes and states as following:

### INTRODUCTION AND AGENT'S BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as **716 Old Coors Drive SW,**

**Albuquerque, NM 87121,** hereinafter referred as "SUBJECT PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.       I have been an HSI Special Agent since September 2018.  I am assigned to the

Office of the Special Agent in Charge in El Paso, Texas.  I am a federal law enforcement officer

of the United States within the meaning of Federal Rules of Criminal Procedure 41(a)(2)(C) that

is, a government agent who is engaged in enforcing the criminal laws and is within any category

of officers authorized by the Attorney General to request a search warrant.

3.       As a federal law enforcement officer, I have specialized training and experience in

human smuggling investigations, including six (6) months of investigative training at the Federal

Law Enforcement Training Center in Glynco, Georgia.  During my employment with HSI, I have

participated in investigations related to the transportation, harboring, and smuggling of illegal

aliens or Undocumented Non-Citizens (UNC), among other things.  I have participated in

1

numerous aspects of human smuggling investigations, including physical surveillance, execution of search warrants, court authorized tracking of telephone and vehicles, analysis of phone and financial records, and arrests of numerous human smugglers. I have debriefed numerous defendants, sources of information, and other witnesses having extensive knowledge of the inner workings of major human smuggling organizations (HSO), including those operating internationally. I have also spoken on numerous occasions with other experienced human smuggling investigators concerning the methods and practices of human smugglers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by human smugglers to smuggle, harbor, and transport illegal aliens, and to collect and launder their human smuggling derived proceeds.

4.      My training and experience as a law enforcement officer, and my conversations with state, federal and foreign law enforcement officers form the basis of the opinions and conclusions set forth below.

5.      Based on my experience in conducting criminal investigations of violations pertaining to human smuggling offenses, I know that HSOs have developed a number of methods to insulate their illegal activities from detection by law enforcement. These methods are common to major HSOs to varying degrees of sophistication.

6.      I also know that human smugglers routinely utilize fictitious names, or other individuals, in which to register cellular telephones, social media accounts, email accounts, vehicles, real property, utility services, and to send and receive money in order to avoid detection by law enforcement.

2

7.      Based upon your Affiant's training, experience, and participation in this and other human smuggling investigations, your Affiant has reason to believe, and does believe, that:

a.      Human smugglers maintain records and documents relating to their human smuggling activities. I know that human smugglers, especially those involved in the transportation aspect of the human smuggling operations, commonly offer their transportation services to multiple HSOs. Accordingly, they must keep a running account of the number of UNCs they transport for each HSO and the proceeds that are owed to them in the form of ledgers and notes, which are maintained where the smugglers have ready access to them. These records and documents may be handwritten or produced and maintained electronically, and may include, but are not limited to computerized or written books, records, receipts, diaries, notes, and ledgers; and other records and documents relating to the transportation and delivery of UNCs, the outstanding debts and collections from UNCs that have been delivered, and the distribution of the human smuggling proceeds;

b.      Human smugglers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies. However, it is very likely that they will maintain records and documents that are evidence of such purchases. These records and documents may include, but are not limited to: deeds for real property, contracts relating to the purchase of other types of property, and the receipts and monthly billing statements for such properties;

c.      Large-scale human smugglers commonly conceal their proceeds, and records of UNCs that have been delivered but are pending a portion of the smuggling fees in secure locations within their residences, typically in safes and/or lockboxes, for their ready access and to

3

conceal them from law enforcement authorities.  These records and documents may include, but are not limited to:  bulk cash, cashier's checks, money orders, other monetary instruments, and human smuggling ledgers;

    d. Human smugglers commonly maintain records with the names, nicknames, addresses, and telephone numbers of both their current and past human smuggling associates. These records may include, but are not limited to:  handwritten notes, ledgers, diaries, and computerized lists;

    f. Human smugglers will attempt to legitimize the profits from their human smuggling transactions by using domestic banks and their attendant services (e.g., bank accounts, safe deposit boxes, securities, and cashier's checks).  These records and documents may include, but are not limited to:  bank statements, safe deposit statements, receipts, and related records;

    g. Human smugglers use various methods to transport UNCs, and travel to meet other co-conspirators, and sources of supply for the UNCs.  These methods of travel include, but are not limited to: commercial airlines, commercial motor vehicles, private motor vehicles, and government and contract mail carriers.  Your Affiant knows that human smugglers will often maintain records or documents relating to their human smuggling-related travels in their residence, including, but not limited to:  airline ticket receipts and itineraries, commercial bus receipts, lodging receipts, meal receipts, credit card receipts, rental car receipts, and luggage tags reflecting points of travel;

    h. Human smugglers are also known to have firearms in their possession (on their person, at their residence).  These firearms are most often used and/or maintained in order to protect and secure their cash and property, and at times to intimidate UNCs and their families to

4

demand payment for their human smuggling services.

        i.      Human smugglers are not like any other individual in our society in the way they maintain documents and records. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. Often times this type of evidence is generated, maintained, and subsequently forgotten. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are the documents they keep. It is also your affiant's experience that the larger and more complex a continuing criminal enterprise is, the more documentary evidence is generated during its course of commission. These records and documents include, but are not limited to: photographs and video recordings - such as proof of life videos - cellular telephone bills, address books, contact lists, accounts and records in fictitious names, carbon copies of money orders and cashier's checks evidencing large cash expenditures, correspondence, and records indicating the existence of storage facilities used in human smuggling schemes; The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for human smuggling organizations. Computer hardware, software, documentation, passwords, and data security devices, electronic media storage devices (CDs, DVDs, thumb drives, etc.), and cellular telephones may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to electronically collect and store any and all of the above-listed records, documents, and items relating to the user's human smuggling activity. Human smugglers frequently use some or all of these devices to communicate with co-conspirators, and others involved in the human smuggling trade. These communications

include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of human smuggling. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the human smuggler is calling, and thus the identity of potential associates. Rule 41, Fed.R.Crim.P, permits the government to search and seize computer hardware, software, electronic storage media, documentation, passwords, data security devices, and cellular telephones, which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the property of the SUBJECT PREMISES in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media, such as computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  For this reason, I submit that if a computer aided digital medium or storage medium is found on the property of the SUBJECT PREMISES, there

is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B). Because several people appear to share the SUBJECT PREMISES, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

18.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

19.     *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can

7

take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

20.     *Technical requirements.*  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

21.     *Variety of forms of electronic media.*  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

22.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying of computers, cellular devices, and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### FOR INCLUSION IN THE AFFIDAVIT IN SUPPORT OF THE WARRANT

1.     The warrant I am applying for would permit law enforcement to obtain from

8

certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

      a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

      b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

      c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on

the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been

entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

        g.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

        h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same

11

individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

8.    Affiant makes this Affidavit in support of an application for a search warrant for a residence located at 716 Old Coors Drive SW, Albuquerque, NM, (hereinafter also referred to as the SUBJECT PREMISES) in connection with an investigation into the harboring and transportation of illegal aliens and other illegal activities by Adrian ROCHE-Alvarez (ROCHE), and other members of the HSO, known and unknown.

9.    The following information is based upon my personal knowledge, information provided to me by other agents, and an investigation into the human smuggling activities of ROCHE, and other unidentified co-conspirators, and is presented as probable cause to search the SUBJECT PREMISES. Since this affidavit is being submitted for the limited purpose of establishing probable cause, your Affiant has not included each and every fact known regarding the instant investigation.  More specifically, your Affiant has set forth only pertinent facts that your Affiant believes are necessary to establish probable cause.

10.    This investigation targets the ROCHE HSO, believed to be operating in the El Paso, Texas and surrounding areas, Albuquerque, NM and surrounding areas. Affiant asserts that the ROCHE HSO is responsible for the transportation of hundreds of undocumented non-citizens from El Paso, Texas to multiple cities further north into the country, utilizing semi tractor-trailers and other means of transportation. Throughout the investigation, agents have identified ROCHE as the leader of the HSO, who has provided transportation services for UNCs to different identified and unidentified human smugglers.

12

11.     On September 14, 2021, Homeland Security Investigations (HSI) El Paso Agents received information regarding the illicit activities of a Florida-based human smuggling organization (HSO). Information indicated Roberto MAYEA-Diaz and Yordano MAYEA-Mayea utilized semi tractor-trailers to smuggle hundreds of undocumented non-citizens (UNCs) from El Paso, TX to different cities into the interior of the United States. During the course of the investigation, Adrian ROCHE-Alvarez (ROCHE) was identified as a coordinator and leader of the HSO. ROCHE is listed as the current owner of 716 Old Coors Dr. SW, Albuquerque, NM (SUBJECT PREMISES) for tax years 2017 - 2023.

12.     On September 17, 2021, HSI El Paso and Ysleta Border Patrol (YST) Anti-Smuggling Unit Agents arrested Yeikel TORNA-JIMENEZ and charged him with 8 USC 1324 (a)(1)(A)(v)(I) – Conspiracy to Transport Aliens. TORNA-JIMENEZ attempted to transport one hundred and forty-two (142) UNCs in a tractor-trailer and was arrested near Anthony, New Mexico. TORNA-JIMENEZ was driving a 2006 Peterbilt 387 – semi-tractor bearing New Mexico license plate number IRL4864 and VIN # 1XP7DB9X46D641344. A database query on the vehicle identification number revealed the tractor belonged to Flatbed Express LLC out of Albuquerque, New Mexico. A business database query of Flatbed Express LLC shows one of the addresses for the business listed as the SUBJECT PREMISES.

13.     During the post-Miranda interview, TORNA-JIMENEZ signed a consent to search form, allowing agents to examine his personal cellular phone. Data extracted from TORNA-JIMENEZ' cellular phone shows TORNA-JIMENEZ received a call from ROCHE's telephone number (505) 267-6103, which TORNA-JIMENEZ had saved in his contacts list as "Trabajo Adrian" just days before the failed human smuggling scheme. Data also shows TORNA-JIMENEZ

13

was in constant communication with Roberto MAYEA-Diaz (Robertico), who was using telephone number (813) 955-3509. Text messages indicate TORNA-JIMENEZ received orders from MAYEA-Diaz and Yordano MAYEA-Mayea to pick up the Flatbed Express LLC's semi tractor-trailer at "Vic's Truck and Trailer Repair" located at 1120 Lowe-Grout Rd., Iowa, Calcasieu Parish, Louisiana on his way to El Paso, Texas. ROCHE's telephone number (505) 267-6103 was listed with Vic's as a contact for the repairs of the semi tractor-trailer.

14.    Telephone tolls for MAYEA-Diaz' telephone number show that during the time the smuggling event was taking place, MAYEA-Diaz was in constant communication with telephone number (505) 312-2870, and ROCHE's telephone number (505) 267-6103. Subpoena returns show the subscriber for telephone number (505) 312-2870 as Adrian ROCHE-Alvarez, and the address listed for the account is the SUBJECT PREMISES.

15.    HSI Agents had received information that telephone number (505) 312-2870 was being used by Carlos Manuel URDANIVIA-Martinez aka "Carlitos Guao" prior to, and during the time of the failed human smuggling scheme. Agents had also identified URDANIVIA as another associate and member of the HSO. Furthermore, URDANIVIA's New Mexico Driver License had the SUBJECT PREMISES listed as URDANIVIA's home address. URDANIVIA was also encountered leading/scouting for the Flatbed Express semi tractor-trailer. At the time Border Patrol Agents (BPA) approached the semi tractor-trailer, URDANIVIA was parked in front of the semi tractor-trailer.

16.    On September 6, 2022, HSI Agents interviewed a source of information (SOI-1) regarding ROCHE, URDANIVIA, and MAYEA-Diaz' involvement in human smuggling activities. SOI-1 told agents URDANIVIA and ROCHE, who SOI-1 knew lived at the SUBJECT

14

PREMISES, were in charge of the semi tractor-trailers. SOI-1 identified ROCHE as the leader/boss of the HSO. SOI-1 told agents URDANIVIA's responsibility within the HSO included following the semi tractor-trailers, or he would drive ahead of the semi tractor-trailers, to make sure there were no service dogs at the Border Patrol Checkpoint so that the semi tractor-trailers could go through. URDANIVIA would then follow the semi tractor-trailers to Amarillo, Oklahoma, or Dallas, where he was also in charge of collecting money (from family members or other people receiving the UNCs).

17.     URDANIVIA would then go to SUBJECT PREMISES where URDANIVIA would give the money to ROCHE. SOI-1 also said on one occasion, SOI-1 saw what SOI-1 described as "a lot of money" in the upstairs apartment at the SUBJECT PREMISES. URDANIVIA also told SOI-1, ROCHE hid his money at the SUBJECT PREMISES. SOI-1 also said ROCHE got upset one time because people were allowed inside one of the apartments where ROCHE was hiding either $50,000 or $500,000 at the SUBJECT PREMISES.

18.     SOI-1 told agents ROCHE owns a lot of properties, but they are not under his name – the properties are under ROCHE's father's name or other people's names. SOI-1 knew the semi tractor-trailer that was apprehended in Anthony, NM was registered under ROCHE's company name or ROCHE's father. SOI-1 added that after the semi tractor-trailer was intercepted, ROCHE was waiting for URDANIVIA at the SUBJECT PREMISES for URDANIVIA to explain what went wrong. ROCHE also told URDANIVIA that he had a bill of sale ready to prove he sold the trailer and it didn't belong to them if anyone came asking.

19.     On February 7, 2022, BPA arrested Yariel JIMENEZ-Mayea and Osmany QUIMCOSO-Cancio for Conspiring to Transport one hundred and thirty-two (132) UNCs in a

semi tractor-trailer in El Paso, TX. HSI Agents were able to confirm ROCHE's involvement in this failed human smuggling scheme. ROCHE had arranged for the repair of the semi-tractor at a local shop in Westway, TX months prior, and paid approximately $20,000 USD cash for the repairs, which ROCHE delivered to the shop. ROCHE also purchased the refrigerated trailer (used in this event) via Facebook Marketplace on January 6, 2022, for $16,000, using a fictitious name. ROCHE had someone else deliver the cash money to the seller to pay for the refrigerated trailer.

20.    On February 9, 2022, two days after the encounter, ROCHE purchased another refrigerated trailer via Facebook Marketplace for $8,000 cash and a day after, ROCHE purchased a blue 2012 International Prostar tractor truck. On March 28, 2022, HSI Agents learned the blue tractor truck and refrigerated trailer were involved in a human smuggling event in McClain County, Oklahoma. News articles reported the event happened at around 9:30 p.m. in McClain County near Wayne at Interstate 35 and Highway 59, where "between 50 and 75 people jumped out of the back of the truck and fled the scene in all different directions." HSI Agents contacted McClain County Sheriff's Office (MCSO), which confirmed the blue semi-tractor and trailer they encountered were the same ones ROCHE purchased via Facebook Marketplace. HSI Oklahoma City Agents (OKC) assisted MCSO with the interviews of seven (7) Guatemalan Nationals that were traveling in the trailer. OKC confirmed the seven subjects were illegally present in the United States, with no documentation that would allow them to be or remain in the United States legally.

21.    On November 23, 2022, a series of telephone conversations between ROCHE (using telephone number (786) 769-4976) and a HSI Special Agent (SA) acting in undercover capacity (hereinafter referred to as UC-1) commenced. UC-1 and ROCHE planned an in-person meeting to discuss future arrangements for ROCHE to transport UNCs beyond the El Paso area

utilizing a tractor-trailer. ROCHE told UC-1 he had a lot of work but wanted to start working with UC-1. ROCHE told UC-1 ROCHE had people working in El Paso and was always ready to help any day because he always had his workers ready.

22.     On March 2, 2023, a second HSI undercover agent (UC-2) began communicating with ROCHE at the same telephone number. ROCHE and UC-2 agreed to meet near exit 0 in Anthony, Texas later the same day.  At approximately 3:30 p.m., UC-2 met with ROCHE at the Whataburger located at 1700 Antonio St., Anthony, TX. ROCHE arrived in a red semi-tractor bearing no registration or markings on the doors, with a silver metal rack on the back of the cab. ROCHE told UC-2 they (meaning ROCHE and co-conspirators) have a route they use that goes around (possibly referring to the Border Patrol Checkpoint) and that's why it takes them longer to travel but they can work any day of the week at any time of day. UC-2 asked ROCHE how many "mojaditos" (mojaditos is a Spanish term commonly used to refer to undocumented non-citizens) ROCHE could transport. ROCHE said as many as UC-2 would like, adding that ROCHE had two tractor-trailers available to move people, to include a refrigerated trailer he could hook up if necessary. ROCHE also said he has moved groups of up to one-hundred and sixty (160) from El Paso to Houston. ROCHE told UC-2 ROCHE had been doing this for a long time, but has been a little distant lately because an individual he used to work with, who would give ROCHE a lot of work, was killed in Ciudad Juarez.

23.     ROCHE told UC-2 if it's less than 30 (UNCs), he transports them in the cabin, but if it's more than that, he transports them in the refrigerated trailer, explaining to UC-2 that he has the refrigerated trailers prepared with small windows in the front and the back for air to circulate. ROCHE then said the checkpoint on I-25 is usually always closed between 8:00 p.m.

and 12:00 a.m. and if it's not closed then they take a different route, which takes a little longer. ROCHE told UC-2 ROCHE would charge $1,500 per person to transport them to Albuquerque and $2,000 per person, if it was more than 50. ROCHE stated he charged $2,500 per person to transport them to Houston. ROCHE told UC-2 he would be willing to negotiate if UC-2 had a lot of UNCs, adding that ROCHE didn't care about the nationality of the people.

24.      ROCHE told UC-2 he had a truck ready in El Paso and assured UC-2 he could fit about 25 in the cab, but they could fit 30 if they wanted to. ROCHE also told UC-2 he has a stash house in Albuquerque and for UC-2 to let him know if he ever needed it. ROCHE also told UC-2 he is not afraid and said he could house the UNCs in his own house too if they needed him to, so long as they paid.

25.      On March 27, 2023, HSI Agents obtained a Cellular Telephone Tracking Warrant for ROCHE's telephone assigned call number (786) 769-4976 (the device). On March 28, 2023, at approximately 8:30 p.m., AT&T began sending email notifications with the global positioning system (GPS) coordinates for the device every 15 minutes. Agents noticed from March 28, 2023, to April 10, 2023, the device's location was mostly around the SUBJECT PREMISES (ROCHE's address) during the week.

26.      On April 11, 2023, at approximately 11:30 a.m., HSI El Paso Agents contacted HSI Agents from Albuquerque (ABQ) to request pictures from the SUBJECT PREMISES. HSI ABQ Agents were able to do static surveillance near the SUBJECT PREMISES and identified and photographed several vehicles of interest parked near each other. Among the list of vehicles photographed was a light color (later determined to be gray in color) semi-tractor parked in the front yard and the red semi-tractor with a silver metal rack on the back parked in the rear at the

SUBJECT PREMISES. HSI ABQ Agents were also able to obtain the temporary license plate of

a black GMC Yukon XL (Yukon) from the same parking lot as 23T-0992099 with an expiration

date in April 2023.

27.     At approximately 4:00 p.m., ROCHE's device began moving south, which

indicated ROCHE was traveling to the area of El Paso, Texas from Albuquerque, NM, based on a

pattern of travel that was previously established. At approximately 4:30 p.m., HSI ABQ Agents

drove by the SUBJECT PREMISES again and took additional pictures. Upon reviewing the

pictures, agents noticed the gray semi-tractor was gone from the yard.

28.     HSI Agents set up static surveillance along I-25 and I-10 and located the gray semi-

tractor being followed by a dark color Chevrolet Suburban. Agents followed both vehicles as they

traveled to Vado, New Mexico, where both vehicles parked and remained for a period of time.

Agents continued surveillance of the vehicles and saw additional vehicles approaching the semi-

tractor's location – a Lincoln SUV bearing Texas license plate number SKF0356 and a red in color

Mercedes-Benz car bearing New Mexico license plate number 469XBA. Agents observed five

females dressed in dark clothing exit the red Mercedes-Benz one by one and board the gray semi-

tractor. NM – 469XBA is registered to GUZMAN-Cutino, Yudisyen (GUZMAN-Cutino had been

identified as ROCHE's wife) with the address listed as the SUBJECT PREMISES.

29.     Agents followed the Suburban to what turned out to be an alien stash house in El

Paso, Texas, where it backed up and parked inside the garage. A few minutes later, the Suburban

exited the garage and began traveling westbound towards Las Cruces, New Mexico. Agents also

observed the semi-tractor depart Vado, traveling westbound towards Las Cruces. Both vehicles

were intercepted in Las Cruces, New Mexico. Agents apprehended twenty-two (22) UNCs in the

cab of the semi-tractor, and fourteen (14) UNCs in the Suburban. HSI Agents also arrested Ardenys GARCIA-Alvarez, the registered owner and driver of the semi-tractor. HSI Agents also identified the caretaker of the stash house in El Paso as Humberto Yosvany ARRIOLA-Rivero.

30.     On April 19, 2023, at approximately 3:28 p.m., the device pinged at the SUBJECT PREMISES. Minutes later, the device began traveling south on I-25 to El Paso. HSI El Paso Agents monitored the device's location and at approximately 8:30 p.m., agents located the black GMC Yukon XL (Yukon) bearing NM temporary registration number 23T-0992099. Agents observed ROCHE driving the Yukon to the Circle K located at 7660 N Mesa St, El Paso, TX 79912. The Yukon met with a white Toyota sedan bearing Florida license plate number 38BSZX. The vehicle is registered to Adrian ALVAREZ-Garcia with an address of 6502 N Habana Ave., Tampa, FL. Additional records checks indicate ALVAREZ-Garcia is a Cuban National who was issued an employment authorization card on 11/2/2022.

31.     HSI Agents followed ROCHE as he traveled westbound in the Yukon to Las Cruces, New Mexico, followed by the white Toyota. The white Toyota passed the Yukon and traveled westbound on I-10 to the Border Patrol Checkpoint located at mile marker 120 on I-10 westbound. HSI Agents were contacted by Border Patrol Agents (BP) from the I-10 Checkpoint reporting the white Toyota at primary inspection. BP Agents identified the driver of the white Toyota as Adrian ALVAREZ-Garcia. BP Agents also said when manpower is low at the checkpoint, they funnel all traffic to the commercial lane and activate the green light, waving every vehicle through without inspecting them until the oncoming shift agents take over the checkpoint responsibilities. Agents believe ALVAREZ-Garcia was scouting for ROCHE, making sure the green light was activated at the checkpoint and Border Patrol wasn't conducting inspections.

20

32.     Meanwhile, HSI Agents observed the Yukon exiting I-10 and parking at the Marathon Gas Station located at 13530 Frontage Rd, Fairacres, NM 88033. Minutes later, the Yukon made a U-turn on I-10 east and traveled back to Las Cruces, NM. The Yukon exited at Avenida de Mesilla and parked at the Applebee's Grill and Bar located at 1601 Hickory Loop, Las Cruces, NM 88005. HSI Agents setup static surveillance around the Applebee's and observed ROCHE exiting the driver's side of the Yukon before walking inside Applebee's, leaving the Yukon running.

33.     About an hour later, HSI Agents observed the white Toyota park at the Applebee's, ALVAREZ-Garcia exited the car and walked inside Applebee's. An HSI Taskforce Agent (TFO) drove to Applebee's and parked next to the Yukon. As the HSI TFO exited the vehicle, he noticed the tint on the windows of the Yukon was very dark and he could not see inside. The TFO also noticed the truck was running and he could see the glare of the screen of the radio. The TFO walked inside Applebee's and observed ALVAREZ-Garcia and ROCHE sitting together at a table inside the establishment. Minutes later, the TFO exited the Applebee's and departed the area. At approximately 10:50 p.m., HSI Agents terminated the surveillance.

34.     At approximately 11:33 p.m., ROCHE's device began to move towards I-10 West. On April 20, 2023, at approximately 12:03 a.m., ROCHE's device pinged west of the Border Patrol Checkpoint on I-10 and continued pinging on I-10 westbound. At approximately 12:18 a.m., the device pinged near Deming, New Mexico. The next few pings showed the device traveling near Highway 26 towards Hatch, New Mexico. The device continued traveling on I-25 north and arrived in Albuquerque, New Mexico at approximately 3:30 a.m. During surveillance of the SUBJECT PREMISES, agents observed ALVAREZ-Garcia in and out of different structures,

particularly Structures A and B.

35.     HSI El Paso and Albuquerque Agents continued surveillance of the SUBJECT PREMISES during the month of April 2023. Agents observed additional vehicles and identified individuals walking in and out of different structures located at 716 Old Coors Dr. SW. Some of the vehicles observed were parked in the open space along the perimeter wall of the property while others were parked in the back, behind a building agents have labeled as Structure A, for reference purposes. Structure A is the building located in the central part of the southern half of the property; Structure A is a blue-gray metal building with a rectangular garage-door like opening with a tan colored covering facing Old Coors Dr. SW.

36.     On April 21, 2023, at approximately 1:23 p.m., agents observed a white Ram cargo van bearing Texas license plate number SRF6575 arrive at the SUBJECT PREMISES. A law enforcement database search shows the vehicle registered to EAN Holdings, LLC with an address of 14002 East 21st St., Suite 1500, Tulsa, OK. EAN Holdings, LLC, the combination of Enterprise Rent-A-Car with Vanguard Car Rental (former parent of Alamo Rent A Car and National Car Rental), does business as Enterprise Rent-a-Car. The vehicle is listed as a 2023 white Ram passenger truck with VIN number 3C6MRVJG9PE521114. An administrative subpoena was submitted to EAN Holdings, LLC and the return shows Yudisyen GUZMAN-Cutino rented the van on April 21, 2023, and picked it up at Enterprise Rent-a-Car located at 3500 Coors Blvd. NW, Albuquerque, NM 87120. GUZMAN-Cutino listed two telephone numbers and her address as the SUBJECT PREMISES.

37.     Agents observed Adrian ROCHE approach the van through the driver side. ROCHE opened the driver side door and talked to the driver (GUZMAN-Cutino) briefly before

they parked the van against the front perimeter wall, facing Old Coors Dr. SW. Once it parked,

Adrian ALVAREZ-Garcia drove the van to the back of the property.

38.     Texas plate SRF6575 has multiple crossings through Las Cruces Border Patrol

Checkpoints: 4/23/2023 & 4/25/2023 through the I-10 west checkpoint; 4/28/2023 through the I-

25 checkpoint north; 5/3/2023 through the I-10 west checkpoint; 5/6/2023 through the I-25

checkpoint north; and 5/7/2023 through the I-10 west checkpoint.

39.     On May 3, 2023, agents observed a maroon semi-tractor with a logo on the side for

Madera Transport LLC, USDOT# 3743301, MC# 1325945 parked by the black dump trailer at the

SUBJECT PREMISES.

40.     On May 9, 2023, a Border Patrol Agent (BP) assigned roving patrol duties

encountered the white Dodge cargo van (Van) traveling on New Mexico Highway 26. BP

conducted an investigatory stop of the van at about mile marker 43 on NM Hwy 26. BP identified

the driver of the van as Margarito ALVAREZ-Diaz. BP also noticed multiple individuals laying

on the floor of the vehicle, which had no seats or seat belts. BP identified himself as a Border

Patrol Agent and determined the subjects laying on the floor (a total of 21) were illegally present

in the United States. During prior surveillance of the SUBJECT PREMISES, agents observed

ALVAREZ-Diaz walking around, in and out of multiple structures.

41.     On May 24, 2023, A BPA encountered an abandoned bobtail semi-tractor bearing

New Mexico license plates 53230RVC at the Chevron gas station located on North Date St in

Truth or Consequences. The bobtail semi-tractor was the same semi-tractor observed at the

SUBJECT PREMISES with Madera Transport LLC, USDOT# 3743301, MC# 1325945 displayed

on the sides of the tractor. The registration came back to a Ford motorhome registered to ROCHE

out of the SUBJECT PREMISES. Further law enforcement database checks show the vehicle had traveled through New Mexico Highway 26 prior to arriving at the Chevron.

42.     A Sierra County Captain (SCC), with assistance from BPA, approached the vehicle to perform a welfare check, suspecting persons were in the vehicle and could be in danger because the outside temperature was approximately 90 degrees Fahrenheit. SCC and BPA encountered twenty-two (22) undocumented non-citizens in the sleeper area of the tractor.

43.     On Wednesday, May 17, 2023, Adrian ROCHE-Alvarez and his wife Yudisyen GUZMAN-Cutino, along with three other co-conspirators, were indicted by a Federal Grand Jury in the Western District of Texas for 8 USC 1324 – Conspiracy to transport, and conspiracy to harbor illegal aliens.  ROCHE and GUZMAN have not been arrested on the indictment at this time, and the indictment is still sealed.

44.     Since agents began tracking ROCHE's cellular phone, E-911 Phase II data from ROCHE's device has shown ROCHE's overnight location as being at or in the vicinity of the SUBJECT PREMISES at 716 Old Coors Dr. SW, Albuquerque, NM.  Agents have also observed ROCHE at the SUBJECT PREMISES since agents began surveillance of the SUBJECT PREMISES.

45.     Due to the fact that ROCHE operates as a large-scale human smuggler and has been identified as the boss of the HSO, affiant believes that the SUBJECT PREMISES of 716 Old Coors Drive SW is likely to contain receipts from previous UNC load runs to include gas receipts, food receipts, hotel receipts, tolls paid receipts, etc.  Affiant also believes that there will be ledgers and logs at the SUBJECT PREMISES that catalog the transportation and delivery of IAs by ROCHE and his associates, as well as cell phone(s) and computer(s) that contain contacts and information

24

about ROCHE's HSO. ROCHE has overnighted at the SUBJECT PREMISES since late March 2023, so agents believe strongly that the above-listed records, documents, and items will be located in the SUBJECT PREMISES, which will constitute evidence of ROCHE's human smuggling activities.

Your affiant has probable cause to believe based on the facts and circumstances set forth above that ROCHE, has facilitated, and is currently facilitating the HSO at the SUBJECT PREMISES, with violations relating to Title 8, United States Code, Section 1324, wherein ROCHE utilized the SUBJECT PREMISES as a base of operations in Albuquerque, NM.

## CONCLUSION

22.    Based upon the foregoing facts, affiant requests that a search warrant be issued for the SUBJECT PREMISES, which is described in Attachment A, which authorizes agents to search for and seize the items listed in Attachment B.


Benjamin Munoz, Special Agent
Homeland Security Investigations

Electronically submitted and
telephonically sworn this 1st day of
June 2023.


JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT B

## ITEMS TO BE SEIZED

A.  Books, records, receipts, notes, ledger and other documents relating to transporting, harboring, and/or delivering illegal aliens.

B.  Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashiers checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

C.  Records, including, but not limited to, address and telephone books (electronic or otherwise); telephone bills; airline tickets, travel receipts, and itineraries; rental car records; lodging records; credit card receipts and statements; storage unit rental records; false identification, and other forms of identification; vehicle titles, and vehicle registrations; and records showing occupancy and/or ownership of the premises.

D.  Proceeds of an unlawful activity, including but not limited to, currency, cashier's checks, money orders, other monetary instruments, jewelry, vehicles and other assets or financial records related thereto.

E.  Photographs and/or videotapes including but not limited to photograph and/or video tapes or storage devices containing such records, of co-conspirators, assets.

F. Firearms and ammunition.

G. Cellular telephones, computers, electronic media storage devices, and related items containing records, documents, and items, which will constitute evidence of human smuggling, and/or assist agents in identifying co-conspirators, drivers involved in the transportation of illegal aliens, sources of supply for the illegal aliens, property derived from alien smuggling proceeds, and locations used by ROCHE and others to facilitate their human smuggling activities.

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**Attachment A**
**Premises to Be Searched**

**716 Old Coors Dr. SW, Albuquerque, New Mexico 87121, Bernalillo County**

The premises to be searched is a multi-structure dwelling located at 716 Old Coors Dr. SW, Albuquerque, New Mexico 87121, Bernalillo County.  The property has several structures on it; Structure A is the building located in the central part of the southern half of the property; Structure A is a blue-gray metal building with a rectangular garage-door like opening with a tan colored covering facing Old Coors Dr. SW. Structure B is the building located in the central part of the northern half of the property; Structure B appears to be a an adobe style building with an awning and multiple doors and windows facing Old Coors. Dr. SW. Structure C is located in the central part of the eastern part of the property, behind and between A and B when viewed from Old Coors Dr. SW; Structure C is a flat-roofed tan colored building with a rectangular opening facing Old Coors Dr. SW. Along the west edge of the property where Old Coors Dr. SW runs is a wall composed of adobe style lower section and metal upper section. The other three sides of the roughly rectangular property are surrounded by metal fencing - the Northern Fence, Eastern Fence, and Southern Fence respectively. There is a gated entry to the property near the southwestern corner of the property.

To include all outbuildings, appurtenances, and vehicles on the property, including, but not limited to, a black GMC Yukon bearing New Mexico temporary registration number 23T-0992099; a white Toyota sedan bearing Florida license plate 38BSZX; a white Mercedes SUV bearing NM license plate RGG674; a beige in color Chevrolet Van bearing Iowa license plate number LBN406; a Honda Van NM Temporary 23T 129522; a dark colored dually Dodge Ram, with a beige stripe running along the bottom of the truck bearing New Mexico license plate BJHJ15; a silver Hyundai bearing NM license plate UNM44209; a white Toyota bearing FL license plate AG50JV; a white dually pickup truck bearing NM license plate NNMC0448; a dark color Chevrolet Cruze bearing NM license plate BGWM94; a black Dodge dually bearing NM license plate BJHJ15; a white Hyundai Elantra bearing NM license plate RNJ213; a red semi-tractor bearing Texas license plate R649541; a white Honda sedan bearing NM license plate RKX916; a dark blue Chevrolet Corvette bearing NM license plate BCGR25.

